IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK MORTENSEN, <br><br> Plaintiff, <br><br> v. <br><br> DWIGHT ARROWOOD, et al, <br><br> Defendants. | Case No. 23 cv 6150 <br><br> Honorable Sunil R. Harjani |

**MEMORANDUM OPINION AND ORDER**

Mark Mortensen was approached by officers at Condell hospital on August 27, 2021, in connection with an aggravated domestic battery charge brought by his girlfriend. While in a squad car outside the hospital, Mortensen experienced chest pains and was brought back inside. At some point, he left the hospital without being discharged, unnoticed by the officers. After an hour of searching, the police located Mortensen at a gas station parking lot. He proceeded to flee, dodge three police cars, and ran through a busy intersection—in his socks. At which point, Deputy Arrowood, who was nearby, commanded his K9 to apprehend Mortensen.

Mortensen has sued Deputies Dwight Arrowood, Michael Bassi, Kevin Gauer, and Wayne McCracken, Sergeant Michael Kuvales, and the Lake County Sheriff pursuant to 42 U.S.C. § 1983 for violating his constitutional rights under the Fourth and Fourteenth Amendments. Mortensen alleges that the use of a K9 and the subsequent twenty-second bite was excessive force, and that the other officers failed to intervene to stop this event. The Court finds that no reasonable jury could find in favor of the Plaintiff, and for the reasons stated below, Defendants' Motion for Summary Judgment [67] is granted.

**Background**

The facts at issue in this matter are largely undisputed. On August 27, 2021, Deputy Gauer went to Sarah Bilby's home because she wanted to report a domestic battery. [83][1] ¶ 16. Bilby told Deputy Gauer that Plaintiff Mark Mortensen pushed her into a bathtub and kicked her head. *Id.* ¶ 17. Plaintiff then grabbed a knife, and they had an altercation. *Id.* While at Bilby's home, Deputy Gauer observed Bilby's injuries. *Id.* ¶ 18.

That same day, Deputy Michael Bassi located and arrested Plaintiff outside of Condell hospital, told him that he was wanted for questioning about the incident with Bilby, and placed him in the back of a police car. *Id.* ¶¶ 8, 36; [89] ¶ 8.[2] Plaintiff then complained of chest pains and was taken back into the hospital. [83] ¶ 9. Sometime after being readmitted, Plaintiff left the hospital in his socks without being discharged. *Id.*

The manner of Plaintiff's exit from the hospital is hotly contested. According to Plaintiff, he did not know he was under arrest or that he was not free to leave, and that he left the hospital without seeing police. [89] ¶¶ 12–16. Defendants' version of events differs as they assert that Deputy Gauer sat at a desk "10 or 15 feet" from Plaintiff in the emergency room until a nurse informed him that no one was in the room. [83] ¶ 23.

Regardless of what occurred in the hospital, it is undisputed that Plaintiff left the hospital without the officers knowing, and that the police searched for him for at least an hour. *Id.* ¶ 24.

---

[1] Plaintiff filed two documents labeled as the "Plaintiff's Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1(a)(2)." *See* [79] and [83]. As Plaintiff's motions for an extension of time to respond were granted, [80], [82], the Court used Plaintiff's second filing for this Opinion.

[2] Plaintiff was in the hospital because of a work related injury to his right leg from August 20, 2021, to August 27, 2021. [89] ¶¶ 6–7. Defendants objected to these facts as "nonmaterial" and "false" but failed to properly respond to those facts with citations to specific evidentiary materials that controverts the fact per Local Rule 56.1(e)(3), as such these facts are deemed admitted.

Plaintiff had walked on a bike path from the hospital to a Dairy Queen[3] to call his mom to pick him up. *Id.* ¶ 10; [89] ¶ 19.[4] Then he went to a nearby gas station, where the police ultimately found him. *Id.*

Upon noticing the police, Plaintiff began running away from them. [83] ¶ 44. Plaintiff ran around the gas station, dodged three police cars, and ran through traffic across the street towards where Deputy Arrowood was standing with the K9.[5] *Id.* ¶¶ 44, 60; [67] Ex. 5.[6] Meanwhile, Deputy Arrowood watched this occur while verbally instructing his K9 to "get him" multiple times. [89] ¶ 23; [67] Ex. 21.[7] Deputy Arrowood then deployed the K9 to apprehend Plaintiff. [83] ¶ 60. Plaintiff kept running after the K9 was deployed and after the K9 tried to apprehend him and missed. *Id.* ¶¶ 61–62. The K9 then grabbed Plaintiff's shorts and Deputy Arrowood knocked

---

[3] The Parties refer to this location interchangeably as Dairy Queen or Dairy Dream. As it is immaterial to this Opinion, the Court uses Dairy Queen because that is what Plaintiff said in his deposition. *See* [67-1].

[4] Defendants respond to this fact by stating "False. (*See* ¶ 17, *supra*; ¶ 21, *infra*.)" [89] ¶ 19. This is an improper response under Local Rule 56.1(e) as Defendants fail to cite specific evidentiary material that controverts the fact or explain how the cited material controverts the asserted fact, and the Court deems that fact admitted.

[5] Deputy Arrowood was a trained K9 handler and was in the area to search for Plaintiff. He placed the K9 on a "six-foot lead". [83] ¶¶ 49–51, 53.

[6] Defendants' Exhibit 5 is Deputy Gauer's dashcam video. In this video Plaintiff can clearly be seen running and dodging three police vehicles with lights flashing (while still in his socks). *See* [67] Ex. 5 at 0:00:30–0:00:50. Therefore, despite Plaintiff denying running around the gas station, his argument is clearly contradicted by the video evidence, and thus the Court relies on the video evidence. *See Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018*)* ("[I]n rare circumstances when video footage clearly contradicts the nonmovant's claims, we may consider that video footage without favoring the nonmovant.") (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

[7] Defendants respond to this fact by stating "False. The Court can count the seconds on the video for itself. (See Dkt. 67, ¶ 66; Exhibit 21.)" [89] ¶ 23. This is an improper objection under Local Rule 56.1 as it only addresses part of the fact and as Defendants do not respond to or provide a cite to specific evidentiary material that controverts the fact or explain how the cited material controverts the asserted fact about Arrowood's statements, the Court deems the fact that Arrowood made those statements admitted. Further, the Court watched Deputy Arrowood's body camera video recording and Deputy Arrowood clearly states "lets get him" multiple times. [67] Ex. 21 at 0:09:38–0:09:44.

Plaintiff to the ground at the entrance to an office building. [89] ¶¶ 35, 36.[8] The K9 took an apprehension bite on Plaintiff's calf just below his knee. *Id.* ¶ 35.

While on the ground and bitten by the K9, Plaintiff shouted that he was "down." *Id.* ¶ 37.[9] The K9 bit Plaintiff's leg for 20-to-21 seconds before releasing on Deputy Arrowood's command. [83] ¶ 65. Arrowood ordered the K9 to release Plaintiff before he was handcuffed. [83] ¶ 67.[10]

While this was happening, the other named defendant deputies were in the area searching for and chasing Plaintiff. Deputy Bassi pursued Plaintiff on foot; he did not see Deputy Arrowood deploy the K9 or apprehend Plaintiff, but when he got through the tree line he saw the K9 biting Plaintiff for 20 seconds. *Id.* ¶¶ 39–40. Deputy McCracken saw Plaintiff running across the street with officers following him, and when he arrived at the vestibule, the K9 was biting Plaintiff. *Id.* ¶¶ 44, 46, 48. Similarly, when Deputy Gauer arrived at the vestibule, the K9 had already apprehended Plaintiff and released Plaintiff 10 seconds after Gauer exited his squad car. *Id.* ¶¶ 26–27. Sergeant Kuvales was in one of the squad cars Plaintiff ran past and took part in arresting

---

[8] Defendants respond to this fact by stating "False. (*See* Exhibit 21 (Arrowood Body Camera Video))." [89] ¶ 36. This is an improper objection under Local Rule 56.1(e), as Defendants fail to cite specific evidentiary material that controverts the fact or explain how the cited material controverts the asserted fact, and the Court deems that fact admitted. Further, Deputy Arrowood's body camera video recording does not contradict anything in this statement.

[9] Defendants respond to this fact with "False. (Plaintiff never 'surrendered' in any factual or legal sense of the word. (*See* Exhibit 21 (Arrowood Body Camera Video.)" [89] ¶ 37. This is an improper objection under Local Rule 56.1 as it only addresses part of the fact and as Defendants do not respond to or provide a cite to specific evidentiary material that controverts the fact or explain how the cited material controverts the asserted fact about Plaintiff's statements the Court deems the fact that Plaintiff was shouting that he was down admitted. Further, Deputy Arrowood's body camera video recording clearly shows Plaintiff shouting that he is down.

[10] Plaintiff's response of "Deny" is insufficient under Local Rule 56.1(e), because Plaintiff fails to cite specific evidentiary material that controverts the fact or explains how the cited material controverts the asserted fact. Therefore, the fact is deemed admitted.

Plaintiff. *Id.* ¶¶ 31, 44, 46.[11]  By the end of the incident, Defendants Kuvales, Bassi, McCracken and Gauer were all in the vestibule while the K9 was biting Plaintiff. [89] ¶ 40.  But they had no control over the K9 and were not trained to give it commands. [83] ¶¶ 28, 34, 41, 71.[12]

As a result of this incident and his altercation with Bilby, Plaintiff pled guilty to domestic battery (reduced from aggravated domestic battery), and attempted escape from police (reduced from escape). *Id.* ¶ 15.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  However, "when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

---

[11] Plaintiff denies ¶ 31. However, as discussed *supra*, Plaintiff's denial that he was running when the police found him is contradicted by the video evidence.  The video is crystal clear—showing Plaintiff, in his socks, running from multiple police cars as they chase him.  Further, Plaintiff's denial does not comport with Local Rule 56.1 as it fails to explain how the cited evidentiary material controverts the fact.  As such, the Court deems this fact admitted.

[12] Plaintiff's response of "Deny" to ¶ 71 is insufficient under Local Rule 56.1(e), because Plaintiff fails to cite specific evidentiary material that controverts the fact or explains how the cited material controverts the asserted fact. Therefore, the fact is deemed admitted.

5

**Discussion**

Defendants contend that they should be granted summary judgment on all four counts. Starting with Plaintiff's two excessive force claims against Deputy Arrowood, Defendants argue that Deputy Arrowood's deployment of the K9 was objectively reasonable given that Plaintiff was fleeing arrest for a serious crime, and that Deputy Arrowood is entitled to qualified immunity. Plaintiff argues that he was not fleeing from the police because he did not know he was under arrest and that he surrendered when caught, so allowing the K9 to continue to bite him was unreasonable. Plaintiff also contends that qualified immunity is a question of fact and thus cannot be decided at this stage. Defendants next argue that they should be granted summary judgment on Count III against Defendants Kuvales, Bassi, McCracken and Gauer for failing to intervene because they had no opportunity or ability to intervene. Plaintiff responds that whether Defendants Kuvales, Bassi, McCracken, and Gauer could have intervened is a question of fact which precludes summary judgment as a jury could construe the facts to find that the officers were present and had an opportunity to intervene. Lastly, Defendants assert that Plaintiff's *Monell* claim fails because there is no underlying constitutional violation. Plaintiff responds by arguing that there is a genuine dispute of fact as to whether there was a constitutional violation for excessive force and that the failure to train the dog was a moving force behind Plaintiff's injuries.

**I. Counts I and II – Section 1983 – Excessive Force**

Plaintiff makes two excessive force claims against Deputy Arrowood for (1) using his K9 to attack Plaintiff; and (2) allowing the K9 to continue to bite him when he was on the ground. "[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (citing *Catlin v. City of Wheaton*, 574 F.3d

6

361, 367 (7th Cir. 2009)). However, a police officer's ability to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). Whether an officer used excessive force in the context of an arrest is "reviewed under the Fourth Amendment's objective-reasonableness standard." *Cyrus*, 624 F.3d at 861–62. "This inquiry requires an examination of the 'totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake.'" *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000)). Whether the nature and extent of the force used to effectuate an arrest was reasonable depends on specific facts and circumstances, including: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. However, such a determination "of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. This standard is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

      a. Count I – Commanding the K9 to Attack

Starting with Plaintiff's initial claim that Deputy Arrowood commanding the K9 to attack Plaintiff was excessive, Defendants contend that all three of the *Graham* factors weigh in their favor. Before applying the *Graham* factors to the present facts, it is critical to acknowledge the scope of reasonableness in excessive force cases. One end of the spectrum is *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), where the Seventh Circuit affirmed the grant of summary judgment when the officer was in hot pursuit of a fleeing suspect and released a dog, without a verbal warning, to

7

assist in the chase. Upon encountering a fence he could not scale, the suspect threw his hands up saying "I give up" then the dog bit him one second later. *Johnson*, 576 F.3d at 659. The suspect then struggled to get away from the dog, which the officer interpreted as resistance, and struck the suspect to subdue him. The dog bit the plaintiff for five to ten seconds on the upper leg, until the officer could handcuff him. The Seventh Circuit found the fact that the plaintiff turned around, put his arms in the air, and said "I give up" when blocked by a wooden fence did not change the circumstances as the officer was only six to eight feet behind him. Further, the plaintiff only surrendered when he could go no farther; before that he had used every method at his disposal to flee from police. *Id.* at 660. The Seventh Circuit found that the officer's use of force was reasonable because the suspect was in active flight, the lack of verbal warning could not have made a difference, and that the officer had no real chance to give one. *Id.*

On the other end of the spectrum is *Alicea v. Thomas*, 815 F3d 283 (7th Cir. 2016). In *Alicea*, the plaintiff was burglarizing a residence when he saw a police vehicle and fled into the backyard of another house and vaulted into an empty, five-foot deep, above-ground pool and hid there. 815 F3d at 286. An officer with a K9 found the plaintiff hiding in the pool. *Id.* According to the plaintiff, he immediately complied with the officer's instructions, at which point the officer yelled, "You like to rob houses, you f***ing punk?" and threw the K9 into the pool and commanded it to attack him. *Id.* The K9 attacked the plaintiff for several minutes and refused the officer's commands to stop biting him. *Id.* The Seventh Circuit found that the plaintiff was not in active flight at the time of his discovery in the pool, as in his version of events, he was standing still with his arms raised, inside an empty above ground pool surrounded by five-foot-high walls in broad daylight. *Id.* at 289. The Seventh Circuit found it significant that the officer had his gun drawn and trained on plaintiff the entire time and that if plaintiff were to try to flee he would first

8

have to get out of the pool, giving the officer "ample time to discharge his weapon or to command [the K9] to chase and hold" the plaintiff. *Id.* Moreover, the plaintiff gave the officer no indication that he would flee and he immediately complied with the officer's orders. *Id.* The court also found that the officer yelling, "you like to rob houses, you f***ing punk?" before commanding the K9 to attack cast doubt on the officer's assertion that he made a split-second safety decision, as it indicated that he had time to assess the threat the plaintiff posed before ordering the attack. *Id.* Therefore, the Seventh Circuit found that applying the *Graham* factors, the plaintiff was not a sufficient threat to justify the officer ordering the K9 to attack and hold him. *Id.* at 290.

However, the facts here differ from those in *Alicea*. Crucially, Plaintiff was not standing still and immediately complying with an officer's orders, instead he was in active flight.[13] Further, far from giving no indication that he intended to flee once he was caught, like the plaintiff in *Alicea*, Plaintiff continued to run after the K9 was deployed and after the K9 tried to apprehend him and missed. [83] ¶¶ 61–62. This makes the facts here more like those in *Johnson*, where the officer ordered the K9 to attack a fleeing suspect. Here, it is undisputed that Plaintiff was running from multiple police vehicles with lights flashing when Deputy Arrowood ordered the K9 to attack plaintiff. No reasonable jury could find otherwise.

Plaintiff also argues that an inference of retaliation, like the one in *Alicea*, should apply here because the Defendants "were furious that Mortensen had walked out of Condell hospital on Defendant Arrowood's watch mandating an area search." [86] at 7.[14] However, unlike *Alicea*, there is no evidence of any retaliation by the Defendants. In *Alicea*, the officer yelled "you like to

---

[13] While Plaintiff argues that he stopped on the sidewalk before Arrowood gave the command to the K9, this conflicts with undisputed facts and clear video evidence. [83] ¶¶ 60–61; [67] Ex. 21 at 0:09:42–0:09:45.

[14] Plaintiff does not cite to any evidence to support this claim and the evidence in the record is that Deputy Arrowood was only called to assist after the police determined Plaintiff had escaped. [83] ¶¶ 29, 30.

9

rob houses, you f***ing punk?" before commanding the K9 to attack. 815 F.3d at 289. Here, Deputy Arrowood made no such comments and instead instructed the K9 to "get" the Plaintiff as he was running away from police officers that were in hot pursuit. So, there are no facts on which a reasonable jury could rely to establish Deputy Arrowood was acting in retaliation. Further, unlike in *Alicea* where the K9 was biting the plaintiff for several minutes, here the K9 was only biting Plaintiff for 20-to-21 seconds.

Plaintiff also relies on *Trexler v. City of Belvidere*, 716 F. Supp. 3d 662 (N.D. Ill. 2024), as another example of a court refusing to grant summary judgment on an excessive force claim. In *Trexler*, the plaintiff and his girlfriend were walking down a sidewalk when a police officer driving by thought they might be under the age of 18. 716 F. Supp. 3d at 667–68. The officer exited his vehicle with his K9 and instructed the plaintiff to take his hands out of his pocket, which he initially refused to do. *Id.* at 668. The officer walked over with the K9's leash in one hand and a flashlight in the other, and kick the plaintiff while yelling "Fuck, don't move!" *Id.* Plaintiff then pushed and pulled away from the officer, and they both fell to the ground. *Id.* at 669. Four seconds after kicking him, the officer commanded the K9 to bite the plaintiff. *Id.* Over the next fourteen seconds, the plaintiff said "I'm down" five times before the officer ordered the K9 to disengage. *Id.* For another eight seconds, the officer continued to order the plaintiff not to move while the plaintiff said "I'm down" before giving the K9 a second command to disengage. *Id.* The court found that even though the plaintiff had repeatedly refused commands and he was standing behind his girlfriend with an unknown object, he did not pose any threat to the officer. *Id.* at 674. As the plaintiff was stopped for the insignificant offense of violating curfew and when the kick happened, the plaintiff had removed his hands from his pockets and was standing still, a reasonable jury could find there was no reason to separate the plaintiff and his girlfriend with a forceful kick. *Id.* The

10

court also found that a reasonable jury could question whether it was excessive to order the dog to bite plaintiff after he was already on the ground and repeatedly said "I'm down." *Id.*

However, *Trexler* is not persuasive here for several reasons. First, Plaintiff was wanted on a charge of aggravated domestic battery, after the police interviewed his girlfriend and witnessed her injuries. Unlike a curfew violation, this is a significant offense. Second, Plaintiff was not standing still while ignoring an officer's instructions to raise his hands, he was actively running from the police. Third, Deputy Arrowood instructed the K9 to apprehend Plaintiff while he was fleeing the police, not while he was already on the ground saying he was down. Thus, this case is, in all important respects, vastly different from *Trexler*.

Turning to the application of the *Graham* factors, Defendants assert that Plaintiff's crime of aggravated domestic battery is a serious one and that Deputy Arrowood reasonably believed that plaintiff had committed it. Plaintiff responds by denying that the verbal dispute with his girlfriend was at all physical. [86] at 3. However, this assertion directly contradicts both facts Plaintiff admitted for the purpose of this summary judgment motion, and that he pled guilty to causing Sarah bodily harm. [83] ¶¶ 7, 15. Further, when Deputy Arrowood released the K9, he knew that Plaintiff was wanted for aggravated domestic battery. *Id.* ¶ 52.[15] Thus, taken from the viewpoint of a reasonable officer on the scene, Plaintiff was wanted for a serious crime, and the first *Graham* factor leans in favor of Defendant Arrowood.[16]

Next, Defendants contend that Plaintiff posed an immediate threat to the police officers and others. [68] at 5. According to Defendants, Deputy Arrowood believed that Plaintiff could be

---

[15] While Plaintiff admits in part and denies in part this fact paragraph, he does not deny that Deputy Arrowood responded to Condell hospital to locate an individual charged with aggravated domestic battery, he denies that he was told that he was being charged with aggravated domestic battery. Thus, the fact of what Deputy Arrowood was responding to is deemed admitted under Local Rule 56.1(e).

[16] Defendants also contend that fleeing from the police was a serious crime.

armed and ambush him. He also knew Plaintiff had changed from a hospital gown into a white t-shirt and shorts, which indicated an attempt at concealment. *Id.*; [83] ¶ 58.[17] Once, Deputy Arrowood located Plaintiff, he observed him dodging multiple police vehicles and running through a busy intersection. [83] ¶ 60. In response, Plaintiff argues that he left the hospital without seeing any police and then walked down a bike path to a Dairy Queen to call his mom to pick him up.

Viewing the facts in the light most favorable to Plaintiff, the Court must credit his version of events: that he left the hospital (in his socks with no shoes) without seeing any police officers and then walked to Dairy Queen to call his mom to pick him up. However, Plaintiff's argument that he "jogged across" the intersection to avoid traffic before seeing the police for the first time and the dog charging at him, is blatantly contradicted by the undisputed facts and the clear video evidence. [86] at 4. The undisputed facts establish that when the police found Plaintiff in a gas station parking lot, he ran from them. [83] ¶ 44. Plaintiff proceeded to run around the gas station parking lot, dodge three police vehicles, and then run through traffic across the street towards where Deputy Arrowood was standing with the K9. *Id.* ¶¶ 44, 60; [67] Ex. 5.[18] Once Plaintiff reached the side of the street Deputy Arrowood was standing on, Deputy Arrowood deployed the K9 to apprehend Plaintiff without giving a verbal warning. [83] ¶ 60. Thus, when Deputy Arrowood deployed the K9, Plaintiff posed an immediate danger to the officers and the public because he was actively fleeing and demonstrated a willingness to put himself and others in harm's way by running through a busy intersection.

---

[17] Plaintiff's response of "Deny" to this fact is insufficient under Local Rule 56.1(e), because Plaintiff fails to cite specific evidentiary material that controverts the fact or explains how the cited material controverts the asserted fact. Therefore, the fact is deemed admitted.

[18] Defendants' Exhibit 5 is Deputy Gauer's dashcam video, in which Plaintiff can clearly be seen running and dodging three police vehicles with lights flashing. *See* [67] Ex. 5 at 0:00:30–0:00:50. Therefore, despite Plaintiff arguing that he was not running, this is clearly contradicted by the video evidence, and thus the Court relies on the video evidence. *See Horton*, 883 F.3d at 944 (7th Cir. 2018*)*.

The final *Graham* factor—whether he is actively resisting arrest or attempting to evade arrest by flight—is plainly established. While Plaintiff argues that he was not aware he was under arrest when he left the hospital, it is evident by the undisputed fact that he was running from the police at the gas station, that at the time the K9 was deployed Plaintiff was attempting to evade the police by flight. Thus, all three *Graham* factors weigh in favor of Defendant Arrowood for Count I and summary judgment is granted for the Defendants.

### b. Count II – Allowing the K9 to Continue to Bite Plaintiff

Even if the initial use of force was appropriate, the continued use of force against a subdued suspect may still be found to be unreasonable. In this vein, Plaintiff claims it was excessive for Deputy Arrowood to continue to allow the K9 to bite him after he was knocked to the ground and yelled "I'm down." Defendants assert that the length of the bite and the location of the bite were reasonable given the circumstances, and that the bite was released before Plaintiff was handcuffed. [68] at 8. Plaintiff responds that once he was on the ground and yelling "I'm down," he had verbalized his surrender and the need for the K9 to remain on bite dissipated. [86] at 7.

The Seventh Circuit has held that force is only reasonable to the extent it is proportional to the threat posed, and if an officer's perception of the threat changes, so too should the force calculation. *Alicea*, 815 F.3d at 288. As such, "significant force is unreasonable after a suspect has stopped resisting or evading arrest." *Id.* While it is "well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders" the critical determination is whether the "the suspect is indeed subdued." *Johnson*, 576 F.3d at 660. There are certain circumstances when "an officer is not required to take an apparent surrender at face value." *Alicea*, 815 F.3d at 288. Further "an officer will not be held liable if the circumstances under which the force was used evolved so rapidly that a reasonable officer would not have had

time to recalibrate the reasonable quantum of force." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 733 (7th Cir. 2013).

Plaintiff again argues that the Seventh Circuit's holding in *Alicea* supports his claim; but, as discussed above, the facts there are dissimilar to the circumstances here, where Plaintiff had been running from the police until he was bitten by the K9. Further, unlike in *Alicea* where the biting continued for several minutes, here the K9 only bit Plaintiff for 20-to-21 seconds. Plaintiff also relies on *Alicea* to assert that Deputy Arrowood allowed the K9 to continue to bite him in retaliation for the Plaintiff trying to injure the dog when grabbing the dog's face to get him off his leg. [86] at 7. But as with the initial claim, unlike in *Alicea*, Deputy Arrowood did not say anything on which to base an inference of retaliation. 815 F.3d at 289.

Plaintiff also compares this case to *Davis vs. Allen*, 112 F. 4th 487 (7th Cir. 2024). In *Davis*, when the officers arrived, the plaintiff—who had several outstanding arrest warrants for violent felonies—fled into a mobile home trailer. 112 F.4th at 489. The officers, believing that the plaintiff was hiding inside and potentially armed, sent in a K9 to search for him. *Id.* at 490. Before releasing the dog, the deputy shouted a warning from the trailer's doorway, which the plaintiff heard but did not respond. *Id.* The dog found the plaintiff and bit his upper left arm just below the shoulder. *Id.* The plaintiff began screaming and the deputy entered the trailer and yelled for the plaintiff to show his hands and come out. *Id.* Plaintiff responded that he could not do that and that he needed help. *Id.* After about 40 seconds, the deputies moved towards the bedroom where the plaintiff was, while the plaintiff continued to scream for help. *Id.* The parties disputed what the officers could see and whether plaintiff's hands remained visible. *Id.* at 490–91. Once both officers were in the room, the deputy grabbed the K9 and commanded him to let go and the other deputy handcuffed the plaintiff. *Id.* The district court found that the deputies' initial decision to use the K9 to locate

14

the plaintiff was objectively reasonable, which neither party contested on appeal. *Id.* However, disputed facts surrounding whether allowing the K9 to continue to bite the plaintiff was justified prevented summary judgment on the excessive force claim and the qualified immunity defense. *Id.* at 492. The Seventh Circuit found that the question of whether the plaintiff "posed a threat from the viewpoint of a reasonable officer standing at the threshold of the bedroom relies heavily on disputed facts" which must be determined by a jury and prevented jurisdiction for an interlocutory appeal. *Id.* at 494. The Seventh Circuit further rejected the officer's speculation that the plaintiff might abandon his surrender and try to find a hidden weapon as insufficient to overcome the fact-intensive inquiry required in excessive-force claims, because in "every felony arrest there is a risk that the suspect could access a weapon, but that does not give officers free rein to continue inflicting significant force on a subdued, compliant suspect." *Id.* at 494–95.

But unlike in *Davis*, here, all the material facts are undisputed: after fleeing from the police the Plaintiff was bitten by the K9 below his kneecap for 20-to-21 seconds after being knocked to the ground by Deputy Arrowood. As there are no disputed material facts, the Court can decide this case on summary judgment. Further, while it "is 'well-established' that 'police officers cannot continue to use force once a suspect is subdued[,]'" Plaintiff was not subdued until force was applied. *Davis*, 112 F.4th at 495 (quoting *Becker*, 821 F.3d at 928–29). This is not a case where the officers exerted new or additional force on a subdued suspect. *See Abbott*, 705 F.3d at 730–31 (tasing someone who is not resisting arrest a second time when she is lying on her back not moving could be determined by a jury to be unreasonable). Instead, Plaintiff claims that continuing to let the K9 bite him was unreasonable. However, the officers did not allow the K9 to bite Plaintiff for several minutes or after he was clearly subdued, rather the entire incident occurred rapidly and the bite only lasted 20-to-21 seconds.

15

As discussed above, the facts here are more like those in *Johnson*. In *Johnson*, the suspect was running from the police until he threw his hands up and said "I give up" upon encountering a fence he could not jump, a second before the dog was released. 576 F.3d at 660. There, the Seventh Circuit found that the officer did not have to take a fleeing suspects surrender at face value and the dog biting and holding the suspect for 5-to-10 seconds until he was handcuffed was reasonable. Similarly, it is undisputed that Plaintiff was only bitten for 20-to-21 seconds. This is not an unreasonably long amount of time to subdue a fleeing suspect. While the dog bite here was a few seconds longer than in *Johnson*, the bite was released before he was handcuffed. And like the officer in *Johnson*, Deputy Arrowood is not obligated to take Plaintiff's surrender at face value when he had, up until that moment, fled and there was no way for Arrowood to know how Plaintiff "was going to behave once he was cornered." *Id.* Thus, no reasonable jury could find that the use of force was unreasonable and summary judgment is granted for Defendants on Count II.

    **c. Qualified Immunity**

Defendants also argue that Deputy Arrowood is entitled to qualified immunity for his conduct. Qualified immunity shields government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. "Qualified immunity rests on two questions: 'first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation.'" *Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024) (quoting *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021)). The burden is on the plaintiff to establish both prongs, and if they fail on either "the defendant official is protected by qualified immunity." *Id.*

Plaintiff argues that Arrowood is not entitled to qualified immunity because commanding a dog to attack a suspect who is already complying with orders is a violation of clearly established law. Plaintiff relies on *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) to support this argument. In *Becker*, officers went to a suspect's mother's house to execute an arrest warrant. 821 F.3d at 923. The suspect's mother told officers he was alone in the house, and then called upstairs that the police were there to arrest him. *Id.* After waiting 30 seconds, the officer released the K9 into the house and directed the dog to "find him." *Id.* According to the plaintiff, he was sleeping in his bedroom when he heard his mother announce the police were there, so he replied that he was getting dressed and would come down. Within two minutes, he was coming down the stairs with his hands on his head, followed by his girlfriend. As they were descending the stairs, the officer released the K9 and it bit the plaintiff's ankle when he was three steps from the bottom. *Id.* at 924. The plaintiff yelled for the officer to "Call the dog off. I'm coming towards you." *Id.* The officer saw that the dog had bitten him and that his hands were on his head, but did not command the dog to release. *Id.* Rather, the officer ordered the plaintiff to get on the floor, which the plaintiff could not hear over his girlfriend screaming. *Id.* Then the officer yanked the plaintiff onto the floor where he landed on his chest and head. *Id.* In the commotion, the K9 lost its grip on the plaintiff and then bit him harder and continued to bite him while violently shaking its head resulting in the dog tearing out the plaintiff's calf muscle. *Id.* The K9 bit the plaintiff for a few minutes.

On appeal, the officer argued that he was entitled to qualified immunity for the post-surrender use of force. In evaluating the circumstances, the Seventh Circuit considered that even though the plaintiff was accused of a violent crime, it had happened weeks earlier and there was no evidence that the plaintiff was still armed. *Id.* at 927. Further, while the possibility that a suspect is concealing himself and could ambush officers might justify the initial use of the dog, it did not

17

allow for the continued biting after he surrendered peacefully. *Id.* Once it became clear the plaintiff was heading towards the officers with his hands in full view over his head, the use of force was no longer reasonable. *Id.* The Seventh Circuit also rejected the argument that the plaintiff's failure to get on the ground justified the use of force, because even if he heard the command, his failure to lay on the ground while being bitten by a dog with his hands over his head, would have been passive noncompliance insufficient to warrant an escalation of force. *Id.* The Seventh Circuit further rejected the theory that continuing to allow the dog to bite the plaintiff was reasonable because he could have been armed, when the officer himself was armed and was not alone. *Id.* The Seventh Circuit found that since the plaintiff was in the open and not fleeing, he was being arrested for a crime that occurred nearly a month prior, and he surrendered with his hands above his head, that the officer was not entitled to qualified immunity. *Id.* at 929. In doing so, the Seventh Circuit distinguished these facts from those in *Johnson* by noting that in *Johnson* the plaintiff was fleeing from a crime that just occurred and the dog was used to seize him until he could be handcuffed. *Id.* (citing *Johnson*, 576 F.3d at 659, 661).

When comparing the facts here to *Becker* and *Johnson*, this case is far more similar to *Johnson*. Unlike in *Becker*, when Deputy Arrowood commanded the K9 to "get him" Plaintiff was running from the police—he was not in the process of surrendering with his hands up. The fact that, once caught, Plaintiff said he was down, does not instantaneously mean he was subdued and the officer has to stop using force. As in *Johnson*, Deputy Arrowood had no way of knowing how Plaintiff would react once cornered. Further, the officer in *Becker* allowed the K9 to bite the plaintiff for up to three minutes, but here the K9 only bit Plaintiff for 20-to-21 seconds while the officers subdued him. Although there were multiple officers on the scene by the time the K9 released Plaintiff, that fact alone does not establish the bite was unreasonable. Thus, the facts here

18

are unlike *Becker* and more similar to *Johnson* as Plaintiff was not in the process of surrendering and was instead in the process of fleeing arrest until the dog bit him. Therefore, Deputy Arrowood is also entitled to qualified immunity for Counts I and II.

## II. Count III – Section 1983 – Failure to Intervene

Turning to Count III, Plaintiff claims that Defendants Kuvales, Bassi, McCracken and Gauer failed to intervene or take reasonable measures to intervene although they knew that Deputy Arrowood was using excessive force and had the opportunity to intervene. Defendants argue that none of the deputies had a realistic opportunity to intervene as Bassi, McCracken and Gauer did not see the apprehension and Kuvales, who saw it, was ten to fifteen feet away. Plaintiff responds that failure to intervene is a question of fact and that the officers were present and had an obligation and opportunity to intervene.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). In other words, an officer must know the individual's rights are being infringed, and have a "reasonable opportunity" to intervene. *Id.* at 865. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Lanigan v. East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis omitted).

19

First, it is undisputed that none of the other officers, besides Deputy Arrowood were there when the K9 initially bit Plaintiff. [83] ¶¶ 26, 32, 40, 46, 48. Instead, they each arrived at varying points after the K9 had a hold of Plaintiff. *Id.* However, as there was no excessive force, there cannot be a failure to intervene to prevent excessive force. *See Abdullahi*, 423 F.3d at 767–68 ("Though legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene."); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"). Thus, Defendants are granted summary judgment on the failure to intervene claim.

### III. Count IV – *Monell*

Finally, Plaintiff brings a *Monell* claim against the Lake County Sheriff for failing to adequately train, supervise, and control sheriff's deputies about the proper use of K9 partners and excessive force. Here, as the undisputed facts establish there is no underlying constitutional violation, the Lake County Sheriff cannot be liable under *Monell*. *See Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Therefore, summary judgment must also be granted on this claim.

### Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. [67]. Judgment is entered in favor of Defendants and against Plaintiff on all counts of the Second Amended Complaint.

**SO ORDERED.** Dated:

December 3, 2025

_____
Sunil R. Harjani
United States District Judge